**Honorable Ronald B. Leighton**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | |
|---|---|
| ADAM EIFLING<br>ANGELA EIFLING<br><br>    Plaintiffs,<br>    vs.<br><br>NATIONAL CITY MORTGAGE, et al.,<br><br>    Defendants. | **Case No. CV10-5713 RBL**<br><br>ORDER ON<br>MOTION TO DISMISS<br>[Dkt. #s 4 & 8] |

This matter is before the court on Defendant Kondaur's Motion to Dismiss [Dkt. #4] and Defendant PNC's Motion to dismiss [Dkt. #8]. Plaintiff homeowners are in-default borrowers who were apparently on the verge of foreclosure at the time they filed this suit. Defendants National City Mortgage, PNC[1], and Kondaur each played a role in the approximately $1 million loan[2]. At the time of the foreclosure, Kondaur held the note and was the loan servicer[3].

The Eiflings sued, claiming various violations of the Real Estate Settlement Procedures Act, the Fair Debt Collection Practices Act, and the Truth in Lending Act. They claim that the lenders failed to re-negotiate the loan terms with them in good faith,

---

[1] PNC alleges without rebuttal that it and Defendant National City have merged. The Court will treat the two together for purposes of this Order.

[2] Plaintiffs apparently built a $1 million home in Canterwood, near Gig Harbor, using the proceeds of an interest-only loan. PNC suggests that Mr. Eifling was a professional mortgage broker at the time of the loan.

[3] Kondaur also purchased the property at the foreclosure sale.

1  and apparently seek extra contractual (tort) damages.

2  Plaintiffs do not dispute that they owed the debt, and that they were behind on
3  their payments.  They concede: "Plaintiffs do not deny a debt is owing, but inform this
4  court that [they] have been denied the opportunity to negotiate with the holder in due
5  course at any time." [Dkt. #11 at 2].  They argue primarily that their debt was securitized,
6  and appear to complain that they have not seen the original promissory note.

7  Defendants Kondaur and PNC move to dismiss under Fed. R. Civ. P. 12(b)(6).

8  **1.      12(b)(6) Standard.**

9  Defendant PNC correctly identifies the standard to be applied to a Motion to
10 Dismiss under Fed. R. Civ. P. 12(b)(6): A plaintiff's complaint  must allege facts to
11 state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 129 S.Ct.
12 1937, 1949 (2009). A claim has "facial plausibility" when the party seeking relief
13 "pleads factual content that allows the court to draw the reasonable inference that the
14 defendant is liable for the misconduct alleged." *Id.* Although the Court must accept as
15 true the Complaint's well-pled facts, conclusory allegations of law and unwarranted
16 inferences will not defeat an otherwise proper motion. *Vasquez v. L. A. County*, 487
17 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979,
18 988 (9th Cir. 2001). "[A] plaintiff's obligation to provide the 'grounds' of his
19 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic
20 recitation of the elements of a cause of action will not do. Factual allegations must be
21 enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*
22 *v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted). This requires a
23 plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me
24 accusation." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*).

25

26 **2.      The Eiflings' "failure to re-negotiate" claim is legally unsupportable.**

27 Plaintiffs' primary claim appears to be based on the allegation that the
28 defendants failed or refused to negotiate, or re-negotiate the loan's terms with them
   after they fell behind in payments.  As both moving Defendants argue, there is no

legal support for such a claim.  *See Badgett v Security State Bank*, 116 Wn.2d 563 (1991)(duty of good faith does not trump contract terms; lender may stand its ground and insist on performance).

The Eiflings desire to re-negotiate, and their inability to persuade Defendants to do so, is simply not actionable, as a matter of law.  This claim does not, and cannot, satisfy the Rule 12(b)(6) standard, and it is DISMISSED WITH PREJUDICE.

**3.      The Eiflings' extra-contractual damage claim is legally unsupportable.**

Plaintiffs also claim to have suffered "extreme emotional strain" from the foreclosure process, including changing of the locks on their home.  They couch this as an "outrage" claim under Washington law.

Defendants argue that tort damages are not typically available in breach of contract action (or, as here, where there is no claim for breach but Plaintiffs claim tort damages arising from enforcement of the contract).  Additionally, they argue that an extra-contractual "outrage" claim fails facially in this case.

As a general rule, parties to a contract cannot recover economic damages in a tort action arising out of that contract.  *See Alejandre v Bull*, 159 Wn.2d 674 (2007). In unusual circumstances, a claim for outrage may survive this rule.

To assert a claim of outrage, a plaintiff must allege "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to the plaintiff of severe emotional distress." *Snyder v. Med. Serv. Corp.*, 145 Wn.2d 233, 242, 35 P.3d 1158 (2001) (quoting *Birklid v. Boeing Co.*, 127 Wn.2d 853, 867, 904 P.2d 278 (1995)). Any claim of outrage must be predicated on behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Robel v. Roundup Corp.*, 148 Wn.2d 35, 51, 59 P.3d 611 (2002) (*quoting Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989)).

While the Plaintiffs' Complaint (and response to the pending Motions) is less than clear, it is apparent that the only basis for the claim is the changing of the locks on their home during the foreclosure process. This process followed a period of

1  roughly two years in which the Plaintiffs admittedly did not pay anything on their
2  mortgage.
3      As the Defendants point out, the Deed of Trust permitted the lender to do just
4  that in the event of non-payment.  There is no claim that the Plaintiffs were not in fact
5  in default, and the lock changing cannot meet the high burden of an outrage claim as a
6  matter of law.  This claim is DISMISSED with prejudice.
7  **4.    Plaintiffs' RESPA claim is facially deficient.**
8      Plaintiffs claim that PNC violated the RESPA by failing to respond to the
9  Plaintiffs' May 13, 2009  "Qualified Written Request" (QWR) regarding the servicing
10 of their loan.  *See* Complaint at 3, 12 U.S.C. §2605;  24 CFR §3500.21(e).  This letter
11 was sent after default, and challenged and/or inquired about several aspects of the loan
12 including late fees and charges.
13     Plaintiffs argue that their letter was a QWR and that PNC was obligated under
14 the RESPA to respond to it. PNC argues that this claim should be dismissed because
15 the letter was not a QWR, that PNC did timely respond, and Plaintiffs have not alleged
16 or shown any damages under the RESPA.
17     The Court agrees with PNC.  The Eiflings letter did not contain specific
18 reasons for concluding that their account was in error.  See *See Pettie*, 2009 WL
19 1325947, at *2; *Moon v. GMAC Mortgage Corp.*, 2009 WL 3185596 (W.D. Wash.
20 Oct. 2, 2009).  It was instead a general notice of inquiry about the various fees and
21 charges, and a broad request for 22 categories of documentation.  It also demanded
22 what amounted to a concession that the loan payoff amount was the original principal
23 amount of the loan.  The RESPA and the QWR regulation was not designed, and
24 should not be used, as a vehicle to permit in default borrowers to flood their lender
25 with documentation requests, on the hope that a failure to timely comply will lead to
26 an affirmative cause of action, or a defense to a collection or foreclosure action.
27     Secondly, and in any event, Plaintiffs concede that PNC did respond to the
28 Plaintiffs' inquiry – five days later, well within the 60 day required period.  Plaintiffs'
    quarrels with the response, particularly in light of the flaws in their own initial

"QWR," do not establish that PNC failed to respond within the meaning of the RESPA.

Finally, and in any event, the Plaintiffs have not alleged or demonstrated that they were in any way "damaged" by any failure on the part of PNC to respond to their letter of inquiry. Such actual harm is a requirement of a RESPA claim. No such damage is remotely discernable form the Plaintiffs' factual allegations. Plaintiffs' RESPA claims are DISMISSED WITH PREJUDICE.

**5. Plaintiffs Fair Debt Collection Procedures Act claims fail against both Defendants**.

Plaintiffs' final claim is their Fair Debt Collection Procedures Act (FDCPA) claim against both defendants. PNC points out that they are a creditor, not a debt collector, and the FDCPA expressly does not apply to it. 15 U.S.C. §1692a(6).

Kondaur argues, correctly, that the Eiflings have made no factual allegations against it in support of an FDCPA claim. Plaintiffs' response does not attempt to bolster this claim. Instead, it seems to fall back to the all too common "show me the note" argument, which is not a viable cause of action. Plaintiffs' FDCPA claims are DISMISSED.

***

The Motions to Dismiss [Dkt. #s 4 & 8] are GRANTED and Plaintiffs' Complaint is DISMISSED WITH PREJUDICE. Any other pending motions are denied as moot.

IT IS SO ORDERED.

DATED this 15th day of March, 2011.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE